Case No. 19-1065 Irregulators, et al. petitioners v. Federal Communications Commission, et al. Mr. McCullough, Mr. Dunn, the respondents. Mr. McCullough, Mr. Dunn, the respondents. Mr. McCullough, Mr. Dunn, the respondents. Good morning. Yes. May it please the Court. My name is W. Scott McCullough. I'm counsel for the petitioners, Irregulators, et al. The Irregulators are six individuals acting in the role of consumers in an effort to obtain reasonable rates on the interstate side, but even more specifically on the intrastate side. The case before you involves an order from the Federal Communications Commission extending what was known as a separations freeze, which basically froze certain factors that are used to allocate costs between the intrastate and interstate jurisdictions. Many of these factors were initially frozen in 2001, and they were supposed to only be in place for five years. There have been seven extensions. The freeze has currently been in place for some 16, 17 years. The order before you extended that freeze once again for six years over our objection. Counsel, the primary source of the petitioners' concern appears to have been the idea that the freeze compelled state regulators in performing their functions to follow the jurisdictional separations as frozen, but at least so far as the price cap carriers who appear to be the firms selling to the individual petitioners. That seems clearly not to be the case, and I call your attention to Section 32 of the Forbearance Order applying to AT&T in which the commission says, we have some objections about this, whether this will mean that the state regulators won't have these data to rely on because no one will be compelling the firms to produce them. And the commission says, yep, that's right. States will have to use their own devices to get data. What the commission said in those paragraphs was that the states could invoke state law to require price cap carriers subject to their jurisdiction for intrastate purposes to obtain the information they needed to apply the proper factors. Apply the proper factors? Yes. What those paragraphs say is that the state commissions can get the information they need to determine intrastate costs, but what it does not say is the states can make up their own factors or assignments. It does not say they can set factors. They do not have authority under Sections 2 and 10 to maintain Federal regulatory requirements that meet the three-pronged forbearance test in order to maintain regulatory burdens that may produce information helpful to state commissions. But if the price cap carriers are not bound by these information-generating forces, what is the basis of your claim that the commission assumed that the price cap carriers, for purposes of intrastate regulation, were governed by those factors at all? If you take a look at paragraph 18 of the freeze order, and now I'm speaking of the freeze order, not the forbearance test, it acknowledges that separations is still relevant to the commission and to the states for certain purposes. Right. And they speak to how the states use separations information for various things, including intrastate USF assessments and taxes. And you also must keep in mind how we started this separations notion. Well, to slow down a bit, the first clause of paragraph 18, the commission uses these only for carriers subject to rate of return regulation. The commission, the FCC does. But it goes on to note that the states use it for other purposes, including the intrastate USF program. And I would point out, going back to the forbearance order, that the commission did not This is intrastate universal service support. Yes. Are you saying that the federal law compels the states to use these data for their calculation of their universal service support? How could that be legally? Our contention is that ever since the 1800s, in the Smith decision from the Supreme Court, for so long as there is dual regulation, there must be a reasonable appropriation between the state jurisdictions and the intrastate. Indeed. And the question here is who performs it. And under what? If the, with respect to the price cap carriers, the feds have withdrawn from the field, then it's up to the states, subject, as you argue at some point in your papers, subject to a possible claim of violation of due process. Yes. Indeed. Yes. But that's different from saying that the customers of price cap carriers are affected by this. In the state price cap regimes, there is what is known as an exogenous factor. While it is true that price caps, both state and federal, do delink costs and prices to some extent, it does not do so completely. Every price cap regime at the state level has what's known as an exogenous adjustment, and one of the major components is changes in separations factors. And so if separations factors change, then on the state level, the commission can adjust intrastate price cap prices. I'm sorry. And so the question here is who says that? Very careful about intra and intra. Yes, sir. So I'm sorry. So repeat that sentence with leading me carefully through intra and intra. I'm speaking of the intrastate price cap regimes. Okay. Every single one of them has what is known as an exogenous adjustment. Okay. That's a state law choice. Yes, it is. And pursuant to that exogenous adjustment, when there is a change to separations factors, it is flown through intrastate price cap rates. Again, a state choice. Yes. And so the question here is could a state today decide that rather than accepting assignment at 75% of common loop costs or 60% of corporations' operations expense? In Verizon New York alone, that's $1.1 billion a year. If they wish to reduce that factor, and what the commission has never said expressly, is that the states are free now from the compulsion in 221, the statutory preemption. Which follows from only when there's been a voluntary exercise of the power to impose the separation. I agree. And one of the things we have to sort out here is whether the way that this forbearance works, if Part 36 is now an informal method, like this court described in Crockett, or if they have completely withdrawn. And what I'm trying to suggest is the commission has not said it has completely withdrawn. It has not said that the states could change the factors. Now, if it says that. What does it need to say more than it said in Paragraph 32 of the forbearance order? If you read this, they don't say you can change the factors. They don't say that. They don't say that, but they also say, we're not going to oblige the price cap carriers to make these calculations at all. But the states can. Well, that's the state choice. Isn't the whole point of separation that the regulatory scheme that applies to interstate calls is different from the regulation that applies to interest? It can be. That's why you separate in the first place. It is. And interestingly, the situation we're kind of arguing about here is similar to what you had to face in your dissent in Mozilla. In that case, the FCC said, in that situation, the FCC was saying we have foreborn, and that precludes the states from erecting similar rules. Yeah, that was a very specific decision purporting unsuccessfully to require states to follow the federal rule. Here the sole question is, is there a clear and unambiguous withdrawal of the FCC so that 221 no longer preempts the states? And we are back in this situation for price cap carriers before 1934 with Section 221, where the reasonable appropriation required by Smith is once again performed at the state level using methods and factors and formulas developed by the states. I mean, I agree they don't spell that out. They do not. And here's our problem. It's not clear to all of me that that was business that required to be spelled out in the forbearance order itself. Well, but it did in the freeze order because we were telling the commission that the states were still bound and could not change factors. And it disagreed with us. It said it's irrelevant, but they never said, yes, they can change factors. That's why you're wrong. If you read the forbearance orders and if you read the freeze orders, they never say we have completely withdrawn. And that makes sense. If you look at the forbearance order, the commission did not forbear from Part 36 sub Part C, the revenue side of the Part 36 rule for price caps. That's expressly stated in the forbearance order. So how can you completely withdraw from the field if you're still keeping a part of the rules? Now, these were the revenue rules, not the cost rules. But you can't completely withdraw if you're hanging on to part of it. But to the extent that there was an incomplete withdrawal with respect to revenue, you aren't complaining about that aspect of it, right? Are you? It has implications for the way the states determine what costs, revenues, and facilities. I don't think you make this argument at all in your papers. We do. We speak to the USF programs. We explain how. Speak to USF, indeed. Well, we also speak to regulatory assessments. And then we explain how the same situation applies to intrastate price cap regimes. Part 36 is about costs, revenues, and it identifies facilities. And if the commission has absolutely withdrawn, it has said we are not compelling you anymore pursuant to 221. And you are now free, states, to devise your own method and your formulas to determine what is intrastate. We will accept that result, but they haven't said that. Is that a virtually inevitable inference from withdrawing from mandating that the price cap carriers produce the data? I don't think so. It doesn't necessarily follow. I think you can just as easily read the forbearance order to say we're going to allow the states to invoke state law to require price cap carriers to obtain, to provide information so that our formulas can apply. So that our formulas? Yes. Boy, you don't point me to any actual language that says that. That's in that period between 29 to 34 in the forbearance orders. And you also have to understand the FCC's own practice is to still follow the separations, results, and rules, even for price cap carriers. For example, direct assignment of private lines is a creature of Part 36. And yet the commission has gone down the road, this court has reviewed some of the BDS orders where the commission uses the 10% rule on how you determine what is intrastate comes straight out of Part 36 on the cost side. Subcategory 1.2 in the private line rules to talk about what BDS prices and facilities and services are an issue before the FCC. They at least informally operate as if all of this still applies in some fashion. And until it is absolutely clear that the states are free, we cannot go to the states and say change the factors. Because they will tell us just like Maine did, we're bound. Let me just assume, arguendo, that you're completely right on that. Let's further assume that in oral argument, which is about to follow in a few seconds, the counsel for the commission unequivocally says that as a result of these various things, the states are not bound by the results of the Part 36 requirements. We will accept that representation. We will embrace it. We will lose all the merits on this issue so long as it is precedential and well spelled out so that we can take this to the states. We will be satisfied with that. We are willing to go to the states, but we do not believe that under these orders the states have yet been set free. If counsel says they have and it is clear and unequivocal and the court embraces that, we will take it. Just for curiosity, do you have any episode of an exchange with state regulators in which you said, look, you guys are really completely free of the results of that. Use your freedom to get it right. I'm not at liberty to talk about discussions I've had with state regulators, but I can point you to the 2014 Maine case where they expressly held they were still preempted. We are not bound by their interpretation. That is true. And if you tell Maine they were wrong, we will happily go back to Maine and tell them try again. I see my time is up. Thank you very much. Counsel for the commission. Good morning, Your Honors. Matthew Dunn for the FCC. I think there are two points that would be helpful to make to address the ongoing colloquy there between Judge Williams and Petitioner's counsel. I think the first point I would like to make is if there is uncertainty about the extent to which states are bound, I don't think that that goes to Petitioner's standing here. I think they have a burden to establish that they're harmed and they haven't met that burden. Sort of to the side, if they want more clarity about that, I think the mechanism for that is to go to the commission and petition for a declaration. Make it patently clear that this is the case. That being said, I agree with Judge Williams that I think almost the only reading of the AT&T order is that states are not bound. But if they want any more clarity, as a lawyer at the podium, I can only go by what's in the orders. I think if they want something more clear than what's already written, what they should do is petition for a declaratory ruling. But I would like to make another point that I think goes to this case directly on standing. Even if it were the case that they are harmed in the way they allege as price cap consumers, we have, I think, a very clear redressability problem. And I'll just flag that for you. I think you probably understand our point, but this is just an extension of the freeze, these categorizations. If this order were vacated, the freeze lapsed, that wouldn't rewrite the rules. It would simply go back to an older version of the rules and force small carriers to re-perform the calculations. Well, if I understand the petitioner's argument on that, it is that it can be sufficient for standing if the remedy removes an obstacle to the course that the petitioners seek. And would it not be the case that throwing the separations process into the maelstrom for reform, and the commission expresses agreement with the concerns of the petitioners, so presumably would embark on reform, removal of an obstacle is a sufficient remedy for the remediability prong of standing? I think it can be. I don't think there's a showing here that this would move the ball for them at all. I guess one way to think of this is the freeze is not really an obstacle to separations reform. The freeze makes it easier on parties while the difficult policy questions of separations reform are sorted out. But the fact of the freeze is not the reason that reform has not happened. And removing the freeze doesn't make it any more likely that it will happen. Could you elaborate on that? I mean, one thing would be to show that the commission in some process has inquiries underway about the reform of the process. Well, this is part of the docket. This order is not about reform. It's part of a docket that is about reform. And this question has been referred to the joint board, this joint state board. Certainly your briefs here suggest that the expectation of anything from the joint board is rather remote. Well, it's been frustrating for all parties, including, I'm sure, the joint board up to this point. I don't think that that means we can throw up our hands or write off the joint board. But even if the joint board is not the obstacle, let's say that the commission by itself is going to rewrite the rules and not wait on a recommendation, I still don't think that there's a direct connection between the fact of the freeze and rewriting those rules. So is this a fair reframing of what you're saying, that we're really talking about, at least in significant part, talking about a problem with agency delay, at least as read by the petitioners. They won't reform. They want it fast. I think that's right. The commission agrees there should be reform and it wants it done. It explicitly says it wants it done in conjunction with various other changes and that they should be approached holistically. And that even to the extent that unfreezing the freeze might push the process, it's still the fact that all these coordinating things have to be resolved. I think that's precisely correct. Some of these things have been resolved. If you look at this as sort of a 20-year process of rewriting the rules which govern wireline carriers, there have been some very big rulemaking, some of which have been in this court, about inter-carrier compensation, universal service reform, business data services. A lot of those big pieces are now out of the way. So these rules now have to be revised in light of those changes. That's exactly right. Are there no further questions? All right. Thank you. I ask that you dismiss the petition for tonight. All right. Counsel for a petition. Well, I was unable to extract precisely what you wanted. You got far closer than we have. Thank you. And for that, I thank you. The price cap issue is, of course, our biggest issue. It is not the only issue. We did express some concerns about the rate of return carriers. And we showed standing to deal with that issue as well. As I understand it, your standing claim there is that the price cap carriers' rates are affected by the rates of the rate of return carriers, which are supplying service to them, right? It is an indirect. We are one step removed from the rate of return carriers. And the price cap carriers, by definition, are operating under price caps. Yes. And I guess one obvious problem with your argument would be they're bumping up against them. Without showing that the price cap carriers relevant to your petitioners, without showing that they have wiggle room, the price cap is there and nothing will change. Let me clarify a couple of things. First of all, with regard to the price cap carriers, their pass-through of their USF assessment is not under price cap. It must be provided. I understand that. Similarly. I thought we were talking first of the actual costs incurred by the rate of return carriers. Well, each of the petitioners also has wireless service and they make long-distance calls. And they pay USF pass-throughs on that. If you jump back to USF, you had a significant part of your papers independent of USF. Oh, yes. Yes. It is a means by which we are trying to show standing for purposes of the rate of return. Let's stick with that for a moment. I beg your pardon? I wanted you to stick with that for a moment and address the question, if it is the case that the relevant price cap carriers are bouncing up against their caps, that is to say charging simply the cap rate, and I didn't see anything in the record saying the contrary, then it's not going to make any difference what happens with the rate of return carriers. The consumer role that we are wearing with regard to the rate of return carriers isn't tied to the fact that any of us buy from a price cap carrier. It is that we use cell phone providers and long-distance carriers who pay switched access rates to the rate of return carriers and pass that through to us. It is also because we pay USF assessments on those. Now, in addition, the price cap, as a price cap carrier customer, we pay the USF pass-through, and the price cap carrier pays into the state and interstate USF regime, the money is disbursed. And so we are, even as a price cap carrier customer, an indirect contributor to the rate of return carriers, and that is passed through to us on a pro rata basis. It's not under price cap. The subsidies for the rate of return carriers are in turn capped, and I didn't see anything showing that any kind of foreseeable reduction in rate of return, improvement in rate of return carrier economics would actually affect the USF charge that was being passed on to you. If a rate of return carrier changes its factors, it will have the effect of moving costs to the interstate side and reducing costs on the intrastate side. Revenues will go down concurrently, and our USF pass-through on the state side will also go down. Oh, the USF pass-through on the state side? Yes. That's the state's choices. It is indeed, but once again, it all ultimately ties back to the separations factors. And it is uncontested here. So let me just try to pin this down. So if it is the case, either with counsel's concession or with, as a matter of fact, our own ruling, there is no federal legislative requirement on the states to use the jurisdictional separations in any of their calculations, you're home free. A big chunk of our issues go away. A big chunk of them. Not all of them. It is obviously much smaller. We still have the impact on the rate of return carriers. We still do. And I think we have standing to contest the commission's decision to make the change voluntary. And I think that a really good showing was made that some real progress has to be made. And let me speak to the remediation here. Yes. We understand that there is going to be some regulatory burden. We do. The problem that we have is the regulatory burden involved in trying, if assuming the freeze goes away. The process. The process. Certainly the carriers, the rate of return carriers in particular, will have a burden. We don't deny that. The question is whether the burden outweighs the benefit. And there is just simply nothing that the FCC found regarding the foregone benefits to consumers from continuing to extend the freeze. Really the only numbers in the case were ours, which showed that on a nationwide basis, yes, with price cap carriers included, the consumer burden from continuing to freeze is somewhere between $14 and $53 billion a year. Now, I submit to you that it doesn't really – I cannot conceive of a burden on carriers that would remotely approximate that. I do not – it's several orders of magnitude small. It could be $10 million, $20 million. Yes. But the consumer benefit far outweighs it. You haven't precisely addressed the timing issue. Let's say if it is the case that the commission has your agenda in mind and is pursuing it in a way that it regards as the proper treatment of the relevant segments of the problem, are you not effectively asking us for – to order them to proceed fast because they've unreasonably delayed? Effectively, that's true. Keep in mind, in the cocktail case, the court said 15 years ago. As you know, I'm sure the obligation we have to meet before finding an agency in unreasonable delay is very, very high. It is, and it found that 13 years, I believe, in the cocktail case was too many. Here we're talking about 18 years already, and it will be extended to 24. Now, we understand that this is complicated, and we're not saying necessarily that if you were to vacate, the commission would have to accept the old rules going back into effect. The commission has the tools to say, okay, we will effectively extend the freeze for a short period of time and spend all of our resources that are possible to solve this problem. But that's exactly the reason why courts are hesitant to find unreasonable delay, because it's a reordering of agency resources. It is. It is, but that's exactly how it turned out in one of the unbundled network element cases when this court vacated the UNI rules. The commission was required to reinstate the rules that just had been vacated, and then it fixed it. So, you know, here's the bottom line, and let's just be really frank. In 2001, the commission rushed to freeze these factors, and the reason it did so was because cost, the cost of things had changed. But there was an overallocation to the interstate jurisdiction. So they wanted to freeze it because they were overburdened. Now the converse is true. The states are the ones that are overburdened, and the commission has not shown a real sense of urgency here to solve this problem because the states are the ones that are having to deal with these excessive rates. But that turns our initial subject. And I will absolutely grant that a huge part of this problem goes away if we get the clear and unequivocal holding that we've been trying to get. There will still be the rate of return problem. It will be a smaller problem, probably manageable. All right. We will take that case under review. Thank you.
judges: Rogers, Katsas, Williams